**Xavier ROMEU, Plaintiff,**

**and**

**Pedro Rossello, in his official capacity as Governor of the Commonwealth of Puerto Rico, Plaintiff–Intervenor,**

**v.**

**William S. COHEN, Secretary of Defense of the United States, William Jefferson Clinton, President of the United States, George Pataki, Governor of the State of New York, and Carolee Sunderland, Commissioner of the Westchester County Board of Elections, Defendants.**

**No. 00 Civ. 2277(SAS).**

United States District Court, S.D. New York.

Sept. 7, 2000.

Xavier Romeu, Condominio el Girasol, Isla Verde Avenue, Carolina, PR, Plaintiff, pro se.

Angel E. Rotger–Stat, Attorney General of the Commonwealth of Puerto Rico, Gustavo A. Gelpi, Solicitor General of the Commonwealth of Puerto Rico, Department of Justice, San Juan, PR, for Pedro Rossello.

Heidi A. Wendel, Daniel S. Alter, United States Attorney's Office—Southern District of New York, New York, NY, for William Jefferson Clinton and William Cohen.

Joel Graber, Office of the Attorney General of the State of New York, New York, NY, for George Pataki.

Joan C. Waters, Deborah A. Porder, Office of the Westchester County Attorney, White Plains, NY, for Carolee Sunderland.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

On March 24, 2000, plaintiff Xavier Romeu filed this lawsuit in an effort to obtain from New York an absentee ballot for the 2000 Presidential election. Romeu, a United States citizen, lived in New York State from 1994 through May 1999 and voted in the 1996 Presidential election. Romeu became a resident of Puerto Rico in May 1999 and registered to vote there two months later. Because residents of Puerto Rico are unable to vote for the President and Vice President, Romeu sought an absentee ballot from New York State. When he received the application

for an absentee ballot, however, Romeu determined that his status as a resident of Puerto Rico prevented him from meeting the application requirements. More specifically, Romeu could not provide a permitted reason for requesting an absentee ballot and could not affirm that he was not requesting an absentee ballot from a territory of the United States.

Romeu alleges that the Voting Rights Amendments of 1970 ("VRA"), the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), and N.Y. Election Law § 11–200 ("NYEL") are unconstitutional, both on their face and as applied, because they deny him his right to receive an absentee ballot from New York State. Romeu contends that his inability to obtain an absentee ballot from New York State deprives him of: (1) his right to vote; (2) his right to travel; (3) the protections of the Privileges and Immunities Clause; and (4) the protections of the Equal Protection Clause. Romeu asks this Court to order defendants—William Jefferson Clinton, President of the United States, William S. Cohen, the Secretary of Defense, George Pataki, the Governor of New York, and Carolee Sunderland, the Commissioner of the Westchester County Board of Elections (the "Board of Elections")—to send him an absentee ballot so he can vote in the 2000 Presidential election. Pedro Rossello, the Governor of Puerto Rico, intervened in an effort to secure similar relief for all residents of Puerto Rico who are American citizens and who previously had voted for the President and Vice President while they were residents of a state.[1]

All defendants have moved to dismiss Romeu's complaint. President Clinton and Secretary Cohen (the "federal defendants") contend that they are not proper parties and that both the VRA and the UOCAVA are constitutional. Governor Pataki argues solely that he is not a proper party. Commissioner Sunderland asserts that: (1) Romeu's complaint raises a non-justiciable political question; (2) Romeu lacks standing to maintain this lawsuit; and (3) the VRA, UOCAVA and NYEL are constitutional. Romeu, for his part, has moved for summary judgment, arguing that the VRA, UOCAVA and NYEL are unconstitutional and that all defendants are proper parties to this action. Governor Rossello joins in plaintiff's motion for summary judgment.

For the reasons set forth below, I conclude that the VRA, UOCAVA and NYEL are constitutional and that Romeu's complaint must be dismissed. Although Romeu is suffering a grave injustice, that injustice stems from the fact that all residents of Puerto Rico are unable to vote for the President of the United States, not from the VRA, UOCAVA or NYEL. While I sympathize with Romeu's plight and applaud his desire to vote in the 2000 Presidential election, I lack the power to provide him any relief. Only a constitutional amendment or Puerto Rican statehood can provide the cure. All I can do is add my voice to those who have urged the appropriate branches of our government to take all necessary steps to ensure that American citizens residing in all United States territories be permitted to vote for President and Vice President as soon as possible.

## I. BACKGROUND

### A. Facts

Plaintiff Xavier Romeu is a natural born United States citizen. *See* Plaintiff Xavier Romeu's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Statement") ¶ 3. In 1994, Romeu became a resident of Westchester County, New York. *See id.* ¶ 2. After complying with all of New York's voting requirements, Romeu voted in the 1996 Presidential election by casting his ballot in Westchester Coun-

---

1. Because Governor Rossello elaborated on Romeu's claims and did not bring any new claims of his own, I refer throughout this opinion to Romeu's arguments. Nevertheless, I have considered the submission of Governor Rossello in ruling on those arguments.

ty. *See id.* ¶¶ 3–4. On May 17, 1999, Romeu moved to—and became a resident and domiciliary of—Puerto Rico. *See id.* ¶ 5. On July 9, 1999, Romeu registered to vote in Puerto Rico. *See id.* ¶ 6.

As a resident of Puerto Rico, Romeu is unable to vote in the 2000 Presidential election. Article II of the Constitution states in relevant part:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress.

U.S. Const. art II. In 1994, the First Circuit clearly resolved the voting status of residents of Puerto Rico: "Pursuant to Article II, therefore, only citizens residing in states can vote for electors and thereby indirectly for the President. Since Puerto Rico is concededly not a state, it is not entitled under Article II to choose electors for the President, and residents of Puerto Rico have no constitutional right to participate in that election." *Igartua De La Rosa v. United States,* 32 F.3d 8, 9–10 (1st Cir.1994) (citations omitted) (*"Igartua I"*); *see also Attorney General of the Territory of Guam v. United States,* 738 F.2d 1017, 1019 (9th Cir.1984) ("Since Guam concededly is not a state, it can have no electors, and plaintiffs cannot exercise individual votes in a presidential election.").[2] Indeed, residents of the District of Columbia only acquired the right to vote for President and Vice President through the Twenty–Third Amendment. *See* U.S. Const. amend XXIII; *see also Territory of Guam,* 738 F.2d at 1019 ("A constitutional amendment would be required to permit plaintiffs to vote in a presidential election.").[3]

Knowing that he could not vote in the 2000 Presidential election as a resident of Puerto Rico, Romeu requested an application for an absentee ballot to vote in the 2000 Presidential election from Westchester County. *See id.* ¶ 6. On September 27, 1999, Romeu received the application for an absentee ballot (the "Application"). *See id.* ¶ 7. The Application is a standard form provided by the Board of Elections to every person who requests an application for an absentee ballot for federal voting. *See* Declaration of Carolee C. Sunderland ("Sunderland Decl.") ¶ 6. The Board of Elections did not create or modify the Application, which is widely available throughout the United States. *See id.* ¶ 7.

Section 6 of the Application requires the applicant to give a reason for requesting an absentee ballot and provides the following choices: (a) member of the armed forces, uniformed services or merchant marines in active service; (b) spouse or dependent of (a); (c) U.S. citizen temporarily residing outside U.S.; (d) U.S. citizen overseas by virtue of employment or accompanying dependent; (e) other U.S. citizen residing outside U.S.; or (f) special. *See* Sunderland Decl., Ex. B (application for absentee ballot). Section 8 of the Application requires the applicant to swear or affirm, under penalty of perjury: "I am not requesting a ballot from or voting in any other U.S. state, territory or possession or sub[-]division thereof in the coming election(s)." *See id.* According to Romeu, he was unable to return the Application

---

**2.** On July 19, 2000, however, Judge Jaime Pieras, Jr. of the United States District Court for the District of Puerto Rico ruled that residents of Puerto Rico have the right to vote in the 2000 Presidential elections. *See Igartua de la Rosa v. United States,* 107 F.Supp.2d 140 (D.P.R. 2000) (*"Igartua II"*). Because *Igartua II* appears to be in direct conflict with the controlling First Circuit precedent of *Igartua I, Igartua II* does not moot Romeu's claims. Nevertheless, as explained in Part II.E *infra,* Judge Pieras' eloquent reasoning demonstrates the fundamental injustice of the current voting status of residents of Puerto Rico.

**3.** For a thorough discussion of the inability of American citizens living in United States territories to vote in Presidential elections, *see* Amber L. Cottle, Comment, *Silent Citizens: United States Territorial Residents and the Right to Vote in Presidential Elections,* 1995 U. Chi. Legal F. 315.

because he did not satisfy any of the categories in Section 6 and could not make the required affirmation in Section 8. *See* Pl. 56.1 Statement ¶¶ 8–10.

## B. Procedural History

On March 24, 2000, Romeu filed this lawsuit against President Clinton, Secretary Cohen, Governor Pataki, Commissioner Sunderland, and Daniel DeFranchesco, Executive Director of the Manhattan Board of Elections.[4] On June 13, 2000, this Court held a conference to discuss the status of Romeu's case. At that conference, all parties expressed their desire to resolve the case through dispositive motions. *See* Transcript of June 13, 2000 Conference ("June 13 Tr.") at 2–5. The parties completed their briefing of these motions on August 21, 2000.

## C. Relevant Statutes

As a former resident of New York State, Romeu is eligible to apply for an absentee ballot under both the UOCAVA and the NYEL. Romeu admits that he is not eligible to receive an absentee ballot under either statute, arguing instead that his inability to receive an absentee ballot violates his constitutional rights. Before evaluating Romeu's argument, it is important to understand why Romeu is ineligible to receive an absentee ballot under the relevant statutes.

*First,* Romeu is not eligible to receive an absentee ballot under the UOCAVA, which allows "absent uniformed services voters and overseas voters" to submit absentee ballots to their last state of residence. *See* 42 U.S.C. § 1973ff–1(1).[5] The UOCAVA defines "overseas voter" as:

(A) an absent uniformed services voter who, by reason of active duty or service

is absent from the United States on the date of the election involved;

(B) a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States; or

(C) a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States.

42 U.S.C. § 1973ff–6(5). The UOCAVA defines "State" as "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa." 42 U.S.C. § 1973ff–6(6). Finally, the UOCAVA defines " 'United States', where used in the territorial sense" as "the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa." 42 U.S.C. § 1973ff–6(8). Under the plain language of the UOCAVA, Romeu does not reside "outside the United States" and therefore cannot vote by absentee ballot in New York, the last state in which he was qualified to vote. *See Igartua I,* 32 F.3d at 10–11 ("While the [UOCAVA] does not guarantee that a citizen moving to Puerto Rico will be eligible to vote in a presidential election, this limitation is not a consequence of the Act but of the constitutional requirements discussed above."); *Igartua II,* 107 F.Supp.2d at 149 ("[A] citizen who moves from New York to Puerto Rico does not retain the right to vote in New York in federal elections because Puerto Rico, like New York, is another jurisdiction within the United States.").

*Second,* Romeu does not qualify as a "special federal voter" under the NYEL.

---

**4.** On May 5, 2000, Romeu dismissed his claim against DeFranchesco without prejudice.

**5.** Under the UOCAVA, the head of an executive department designated by the President—in this case, Secretary Cohen—was charged with creating an official post card form to

allow overseas voters to register to vote and apply for absentee ballots. *See* 42 U.S.C. § 1973ff(b)(2). States are encouraged to adopt this official post card form. *See* 42 U.S.C. § 1973ff–3(1).

Section 11–200 of the NYEL states in relevant part:

> Every citizen of the United States now residing outside the United States whose last domicile in the United States immediately prior to his departure from the United States was in the state of New York, shall be entitled to vote from such last domicile, as a special federal voter in all primary, special and general elections for the public offices or party positions of president and vice-president of the United States, United States senator, representative in congress and delegates and alternate delegates to a national convention, provided such citizen, at the time of such departure from the United States, could have met all the present qualifications of this chapter ... and provided further that such citizen does not maintain a place of abode or domicile, is not registered to vote and is not voting in any other election district, state, territory or possession of the United States....

N.Y. Election Law § 11–200(1). Romeu does not qualify as a "special federal voter" because he maintains a place of abode or domicile and has registered to vote in Puerto Rico, a territory of the United States, and therefore does not reside "outside the United States." *See* Pl. 56.1 Statement ¶¶ 5–6.[6]

■ Both Romeu's complaint and his brief allege that the VRA also unconstitutionally prevents him from receiving an absentee ballot. The VRA "completely abolish[ed] the durational residency requirement as a precondition to voting for President and Vice President" and "establish[ed] nationwide, uniform standards relative to absentee registration and absentee balloting in presidential elections." 42 U.S.C. § 1973aa–1(b). It states in relevant part:

> [N]or shall any citizen of the United States be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election, if such citizen shall have complied with the requirements prescribed by the law of such State or political subdivision providing for the casting of absentee ballots in such election.

42 U.S.C. § 1973aa–1(c). In addition, the VRA makes clear that "[n]othing in this section shall prevent any State or political subdivision from adopting less restrictive voting practices than those that are prescribed herein." 42 U.S.C. § 1973aa–1(g). Finally, the VRA provides that "[t]he term 'State' as used in this section includes each of the several States and the District of Columbia." 42 U.S.C. § 1973aa–1(h). After studying Romeu's complaint and brief, I am unable to determine how the VRA even arguably prevents Romeu from ob-

---

**6.** Although Romeu's complaint does not mention the NYEL, he does allege that he "has been denied the right to vote in the federal executive elections like any other United States citizen that has acquired said right by virtue of residency in and compliance with the voting requirements of the State of New York." Complaint ¶ 40. In his brief, Romeu asserts that the NYEL is unconstitutional for the same reasons as the VRA and UOCAVA. *See* Plaintiff Xavier Romeu's Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss and for Judgment on the Pleadings and in Support of his Cross–Motion for Summary Judgment ("Pl.Br."). In her reply brief, Commissioner Sunderland includes the NYEL in her discussion of the constitutionality of the VRA and UOCAVA. *See* Defendant Carolee C. Sunderland's Reply Memorandum of Law in Further Support of Her Motion and in Opposition to Plaintiff's Cross–Motion ("Sunderland Reply Br.") at 3, 9. Because Romeu is proceeding pro se and defendant Sunderland has responded to his argument, I will liberally construe his complaint to allege that NYEL § 11–200 is unconstitutional. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 719 (2d Cir.1998) ("[C]ourts may look to submissions beyond the complaint to determine what claims are presented by an uncounseled party."); *see also Soto v. Walker*, 44 F.3d 169, 173 (2d Cir.1995) (pro se complaint should be interpreted so as "to raise the strongest arguments that [it] suggest[s]").

taining an absentee ballot.[7] Accordingly, Romeu's claim that the VRA is unconstitutional is dismissed.[8]

## II. DISCUSSION

### A. Proper Parties

#### 1. Governor Pataki

■ Governor Pataki argues that he is not a proper party to this action because he has no role in enforcing the UOCAVA. As noted above, however, Romeu's brief makes clear that he also alleges that the NYEL is unconstitutional. *See supra* Part I.C.[9] Romeu argues that Governor Pataki is responsible for enforcing the NYEL pursuant to Article 4, section 3 of the New York State Constitution, in which the Governor is charged with the duty to "take care that the laws are faithfully executed." N.Y. Const. art. IV, § 3. "It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of the act." *Schulz v. Williams*, 44 F.3d 48, 61 n. 13 (2d Cir. 1994) (quotation marks and citation omitted); *see also Ex parte Young*, 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

The Second Circuit has never decided whether this general duty, standing alone, makes the Governor a proper party in a suit alleging that one of the laws of the State of New York is unconstitutional. Recently, however, Chief Judge Mukasey stated that "[a]lthough there is some authority to support plaintiffs' position, the vast majority of courts to consider the issue have held—correctly, in my view— that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." *Warden v. Pataki*, 35 F.Supp.2d 354, 359 (S.D.N.Y.) (citations

omitted), *aff'd*, 201 F.3d 430 (2d Cir.1999), *petition for cert. filed*, (U.S. May 8, 2000) (No. 99–9887). Accordingly, I conclude that Governor Pataki is not a proper party to this action and grant his motion to dismiss.

#### 2. Federal Defendants

In their initial brief, the federal defendants argued that they were not proper parties to this lawsuit because the government of New York State, not the federal government, decides who is eligible to vote by absentee ballot in that state. *See* Memorandum of Law of President Clinton and Defense Secretary Cohen in Support of Motion to Dismiss ("Fed.Defs.Br.") at 5–10. In his brief, Romeu contends that the federal defendants are proper parties but also moves for leave to amend his complaint to include the United States as a party. *See* Pl. Br. at 19 n. 11. In response, the federal defendants admit that their proper party objection is "somewhat academic" given that "Romeu has directly challenged the constitutionality of the VRA and UOCAVA ... and has sought to amend his complaint to include the United States as a defendant." Reply Memorandum of Law of President Clinton and Defense Secretary Cohen in Support of Motion to Dismiss and in Opposition to Plaintiff's Motion for Summary Judgment ("Fed. Defs. Reply Br.") at 2 n. 1. Romeu's motion to amend his complaint is granted and, accordingly, the federal defendants' motion to dismiss on the grounds that they are not proper parties to this action is denied.

### B. Standing

Commissioner Sunderland offers two reasons why Romeu lacks standing to bring this lawsuit. *First*, Sunderland

---

**7.** If anything, the VRA provides New York with the authority to enact § 11–200 of the NYEL.

**8.** Because I have dismissed Romeu's VRA claim, I have omitted all references to the

VRA in my discussion of the remaining issues in the case.

**9.** Governor Pataki did not reply to Romeu's brief.

notes that Romeu never applied for an absentee ballot. *See Jackson–Bey v. Hanslmaier,* 115 F.3d 1091, 1096 (2d Cir.1997) ("As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy."). *Second,* Sunderland alleges that neither she nor the Board of Elections played any role in preventing Romeu from receiving an absentee ballot. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' ") (citation omitted).

As an initial matter, Sunderland's argument should be dismissed because she raised it for the first time in her reply brief. *See Restrepo v. United States,* No. 18 M 65, 1999 WL 1044359, at *2 n. 4 (S.D.N.Y. Nov. 18, 1999) ("While this argument may have been suggested in Claimants' moving papers, it was articulated for the first time in reply. As a result, it has not been addressed by the Respondents. An argument may not be raised for the first time in reply."). Although Sunderland's initial brief mentioned that Romeu never applied for an absentee ballot and alleged that neither she nor the Board of Elections played any role in denying Romeu an absentee ballot, the brief neither identified lack of standing as an independent ground for dismissal nor, indeed, even mentioned the word "standing."

Nonetheless, Sunderland's argument must be addressed because standing "is jurisdictional and not subject to waiver." *Lewis v. Casey,* 518 U.S. 343, 349 n. 1, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Thompson v. County of Franklin,* 15 F.3d 245, 248–49 (2d Cir.1994) ("The jurisdictional nature of the standing inquiry ... convinces us that we have an independent obligation to examine Thompson's standing under arguments not raised below...."). Romeu has standing to bring this lawsuit. Romeu did not apply for an absentee ballot because he did not meet the requirements for submitting the Application. Romeu knew that he could not provide a permitted reason for requesting an absentee ballot and could not affirm that he was not requesting the absentee ballot from a territory of the United States. *See* Pl. 56.1 Statement ¶¶ 7–8. Sunderland's brief implies that Romeu might have been granted an absentee ballot if he had completed the Application. *See* Sunderland Reply Br. at 5 ("Plaintiff's entire argument against the [Board of Elections] is premised on the theory that if he had submitted an application to be recognized as a federal voter, the [Board of Elections] probably would have rejected his application and, therefore, he might have been denied his self-styled 'acquired' right to vote in the November 2000 federal election."). As explained above, however, both the UOCAVA and the NYEL contain specific statutory provisions that prevent Romeu, as a resident of and registered voter in Puerto Rico, from receiving an absentee ballot. *See supra* Part I.C. Therefore, neither Sunderland nor the Board of Elections could have granted Romeu's request.

Romeu has standing to challenge the constitutionality of the UOCAVA because the Application, which was promulgated by the Secretary of Defense, reflects the requirements contained in that statute. *See* 42 U.S.C. § 1973ff(b)(2) ("The Presidential designee shall ... prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States as recommended in section 1973ff–3 of this title."). Romeu could not complete the Application because he did not meet those requirements. As a result, requesting that Application was sufficient to give him standing to challenge the constitutionality of the UOCAVA.

■ The analysis for the NYEL is much the same. Romeu did not ask for an absentee ballot because he is not a "special federal voter" as defined by § 11–200. *See supra* Part I.C. Although a plaintiff generally must submit to a challenged policy in order to gain standing, "[t]his threshold requirement for standing may be excused ... where a plaintiff makes a substantial showing that application for the benefit ... would have been futile." *Jackson–Bey*, 115 F.3d at 1096. Notwithstanding Commissioner Sunderland's hint to the contrary, the plain language of ¶ 11–200 demonstrates that it would have been futile for Romeu to apply for an absentee ballot as a "special federal voter." *Compare Stewart v. NYNEX Corp.*, 78 F.Supp.2d 172, 183 (S.D.N.Y.1999) (plaintiffs not required to exhaust administrative remedies where "the issue they confronted was an issue of statutory interpretation, not of administrative discretion") *with Verri v. Nanna*, 972 F.Supp. 773, 802 (S.D.N.Y.1997) (plaintiff lacked standing "where the contours of the alleged policy [were] so vague" that it was "not at all clear that had [plaintiff] attempted to violate the policy he would have suffered any adverse consequences"). Accordingly, Romeu has standing to challenge the constitutionality of the NYEL.

■ Although Sunderland argues that neither she nor the Board of Elections played any role in preventing Romeu from obtaining an absentee ballot, Sunderland sent Romeu the Application that allegedly violates his constitutional rights. Sunderland contends that merely sending the Application fails to establish the requisite connection because the Board of Elections used the federally promulgated form. *See* Sunderland Decl. ¶ 6 (explaining that the "Federal Post Card Registration and Absentee Ballot Request" is provided by the Board of Elections "to all persons who ... request an application for an absentee ballot for federal voting."). The UOCAVA, however, allows states to use their own absentee ballot application, so long as the

alternative application is approved by the Presidential designee. *See* 42 U.S.C. § 1973ff–2(e) (allowing states to use their own absentee ballot application, with approval of Presidential designee). By choosing not to create its own application, New York adopted the federally promulgated form. As the relevant state official responsible for absentee ballots—and the official who sent Romeu the Application—Sunderland has the requisite causal connection with Romeu's alleged injury. *See Schulz*, 44 F.3d at 61 n. 13 ("It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of the act.") (quotation marks and citation omitted).

## C. Political Question Doctrine

■ Commissioner Sunderland argues that this Court lacks jurisdiction because Romeu's claim presents a non-justiciable political question. "[T]he political question doctrine is a function of the constitutional framework of separation of powers. Although prudential considerations may inform a court's justiciability analysis, the political question doctrine is essentially a constitutional limitation on the courts.... [W]here adjudication would force the court to resolve political questions, the proper course for the courts is to dismiss." *767 Third Avenue Associates v. Consulate General of Socialist Federal Republic of Yugoslavia*, 218 F.3d 152, 164 (2d Cir. 2000) (quotation marks and citations omitted). Almost forty years ago, the Supreme Court identified the relevant considerations:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for

nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[10]

None of the *Baker* factors are implicated by a consideration of whether the UOCAVA, VRA, or NYEL violate Romeu's constitutional rights. Sunderland argues that Congress's power to make laws regarding Puerto Rico under the Territory Clause provides a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *See* U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). Several courts, including the Supreme Court, have reviewed laws passed pursuant to the Territory Clause to ensure compliance with the Equal Protection Clause. *See Harris v. Rosario,* 446 U.S. 651, 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) ("[U]nder the Territory Clause ..., [Congress] may treat Puerto Rico differently from States so long as there is a rational basis for its actions."); *see also Besinga v. United States,* 14 F.3d 1356, 1359–63 (9th Cir. 1994) (equal protection review of law passed while the Philippines was a territory); *Quiban v. Veterans Administration,* 928 F.2d 1154, 1158–63 (D.C.Cir.1991) (same).

Romeu has challenged the constitutionality of the UOCAVA, VRA, and NYEL, alleging that they violate his rights in several ways. Whether or not those statutes violate Romeu's rights presents a legal, not political, question, and there is no lack of judicially discoverable and manageable standards for resolving it. *See Igartua I,* 32 F.3d at 10–11 (holding that UOCAVA is constitutional).[11] The remaining *Baker* factors are also inapplicable. An initial policy determination or unquestioning adherence to a political decision is not required, nor is it necessary to show disrespect for or provide an inconsistent answer on a question previously resolved by a coordinate branch of government.

Sunderland essentially argues that, if this Court finds in favor of Romeu, it will be granting him the right to vote in Presidential elections or extending statutory rights beyond their legitimate scope. Those arguments, however, beg the questions posed by Romeu's complaint. If the challenged statutes unconstitutionally violate Romeu's rights, he will have all the rights previously held by him. The Court will simply be recognizing an unconstitutional limitation on an already existing right. That exercise of judicial power does not run afoul of the political question doctrine.

### D. Constitutionality of UOCAVA and NYEL

I next turn to the specific constitutional challenges raised by Romeu.

#### 1. Right to Vote

The Supreme Court has repeatedly stated that "the right to vote, as the citizen's link to his laws and government, is protec-

---

**10.** Sunderland's initial brief did not explicitly argue that Romeu's complaint should be dismissed under the political question doctrine, although it cited *Baker.* Because the political question doctrine is jurisdictional and the brief provided Romeu some notice, I will address this argument.

**11.** Although the First Circuit did not discuss the political question doctrine in *Igartua I,* the district court held that the case presented an unreviewable political question. *See Igartua de la Rosa v. United States,* 842 F.Supp. 607, 609–10 (D.P.R.), *aff'd,* 32 F.3d 8 (1st Cir. 1994). The First Circuit affirmed the district court without addressing that ground for dismissal.

tive of all fundamental rights and privileges." *Evans v. Cornman,* 398 U.S. 419, 422, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); *see also Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). More than thirty years ago, the Court explained the central importance of the right to vote:

> Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government.

*Kramer v. Union Free School District,* 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (quotation marks and citations omitted).

Romeu argues that the UOCAVA and NYEL deprive him of his fundamental right to vote in Presidential elections. In making this argument, Romeu stresses that he is not contending that all American citizens living in Puerto Rico have the right to vote in Presidential elections. Rather, Romeu's much more narrow claim is that American citizens now living in Puerto Rico who previously lived and voted in one of the fifty states retain that right to vote when they move to Puerto Rico. Under Romeu's theory, the UOCAVA and NYEL deprive him of that right because they deny him the ability to procure an absentee ballot.

■ The problem for Romeu is that, while he might have a fundamental right to vote in Presidential elections as a resident of Puerto Rico, he does not have a funda-mental right to demand an absentee ballot from New York State. The Supreme Court has held that states can impose reasonable residency requirements on the ballot. *See Carrington v. Rash,* 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) ("Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot."); *see also Dunn,* 405 U.S. at 336, 92 S.Ct. 995 ("[T]his Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Evans,* 398 U.S. at 421, 90 S.Ct. 1752 ("Appellees clearly live within the geographical boundaries of the State of Maryland, and they are treated as state residents in the census and in determining congressional apportionment."). "From ... our voting qualifications cases a common characteristic emerges: The challenged statute in each case denied the franchise to individuals who were physically resident within the geographic boundaries of the governmental entity concerned.... [O]ur cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 68–69, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). Indeed, the following passage from *Kramer* (selectively quoted by Romeu in his brief) demonstrates the point:

> Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.

*Kramer,* 395 U.S. at 626–27, 89 S.Ct.

1886.[12]

As a resident of and registered voter in Puerto Rico, Romeu is no longer qualified to vote in New York State. *See* N.Y. Election Law § 5–102(1) ("No person shall be qualified to register for and vote at any election unless he is a citizen of the United States and is or will be, on the day of such election, eighteen years of age or over, and a resident of this state and of the county, city or village for a minimum of thirty days next preceding such election."). From New York's perspective, it does not matter whether Romeu moved to Puerto Rico or to New Jersey. He no longer lives in New York and is no longer qualified to vote there. *See Dunn*, 405 U.S. at 343–44, 92 S.Ct. 995 ("An appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny."). The UOCAVA and NYEL respect this principle by not providing absentee ballots to people who move to another state or one of the territories. Romeu's inability to vote in Presidential elections stems from his status as a current resident of a territory, not a former resident of New York State.

█ Romeu argues that the UOCAVA and NYEL conflict with the VRA, which "completely abolish[ed] the durational residency requirement as a precondition to voting for President and Vice President." 42 U.S.C. § 1973aa–1(b). In order to ensure that all qualified voters had an opportunity to cast their vote in a Presidential election, the VRA required states to implement three policies. *First*, the VRA provided that each state had to ensure that all duly qualified residents of that state could register for the Presidential election at least thirty days before the election. *See* 42 U.S.C. § 1973aa–1(d). *Second*, the VRA provided that each state had to allow all duly qualified residents of that state who were absent from that state on the date of the Presidential election to vote by absentee ballot, so long as the resident applied for an absentee ballot at least seven days prior to the Presidential election. *See id.* *Third*, the VRA provided:

> If any citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any election for President and Vice President has begun residence in such State or political subdivision after the thirtieth day next preceding such election and, for that reason, does not satisfy the registration requirements of such State or political subdivision he shall be allowed to vote for the choice of electors for President and Vice President, or for President and Vice President, in such election, (1) in person in the State or political subdivision in which he resided immediately prior to his removal if he had satisfied, as of the date of his change of residence, the requirements to vote in that State or political subdivision, or (2) by absentee ballot in the State or political subdivision in which he resided immediately prior to his removal if he satisfies, but for his nonresident status and the reason for his absence, the requirements for absentee voting in that State or political subdivision.

42 U.S.C. § 1973aa–1(e).

The UOCAVA and NYEL do not conflict with the VRA because the VRA did not abolish all reasonable residency requirements. *See Dunn*, 405 U.S. at 343, 92 S.Ct. 995 ("We emphasize again the difference between bona fide residence requirements and durational residence requirements. . . . [With the VRA,] Congress outlawed state durational residence

---

**12.** The ability of a state to impose bona fide residency requirements was not even challenged in the above-cited cases discussing the fundamental nature of the right to vote. *See Dunn*, 405 U.S. at 334, 92 S.Ct. 995 ("Appellee does not challenge Tennessee's power to restrict the vote to bona fide Tennessee residents."); *Kramer*, 395 U.S. at 625, 89 S.Ct. 1886 ("Appellant agrees that the States have the power to impose reasonable citizenship, age, and residency requirements on the availability of the ballot.").

requirements for presidential and vice-presidential elections, and prohibited the States from closing registration more than 30 days before such elections.... We upheld this portion of the [VRA] in *Oregon v. Mitchell* [, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).]"); *see also Oregon,* 400 U.S. at 148, 91 S.Ct. 260 ("The effect of [the VRA] is to reduce all state durational residency requirements to 30 days.") (Douglas, J., concurring in part and dissenting in part). The VRA simply sought to ensure that all citizens qualified to vote in a Presidential election would be afforded the opportunity to vote.[13]

Despite his efforts to narrow his argument, Romeu's claim turns on his inability to vote in Presidential elections because he is a resident of and registered to vote in Puerto Rico. Had Romeu moved from New York to New Jersey, he would have retained the right to vote in Presidential elections through the election laws of New Jersey. Romeu lost that right because he moved to Puerto Rico, where citizens lack the right to vote in Presidential elections. The denial of his fundamental right to vote, therefore, stems not from the UOCAVA or NYEL, but from the constitutional status of Puerto Rico.

In 1994, the First Circuit squarely held that residents of Puerto Rico are not eligible to vote in Presidential elections:

> While appellants are citizens of the United States, the Constitution does not grant citizens the right to vote directly for the President. Instead, the Constitution provides that the President is to be chosen by electors who, in turn, are chosen by 'each state ... in such manner as the Legislature thereof may direct.' U.S. Const. art II, § 1, cl. 2. Pursuant to Article II, therefore, only citizens residing in states can vote for electors and thereby indirectly for the President.

*Igartua I,* 32 F.3d at 9; *see also Anderson v. Celebrezze,* 460 U.S. 780, 796, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (explaining the "concerns that motivated the Framers' decision not to provide for direct popular election of the President"); *Buckley v. Valeo,* 424 U.S. 1, 106, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("[A] President is elected not by popular vote, but by winning the popular vote in enough States to have a majority in the Electoral College."). On July 19, 2000, however, Judge Jaime Pieras, Jr. of the United States District Court for the District of Puerto Rico held that all American citizens living in Puerto Rico have the fundamental right to vote in Presidential elections. *See Igartua II,* 107 F.Supp.2d at 144–48. The tension between *Igartua I* and *Igartua II* calls into question the voting status of residents of Puerto Rico.

After reviewing the history of Puerto Rico's relationship with the United States, Judge Pieras explained that while *Igartua I* focused on the "inability [of Puerto Ricans] to vote for the President and Vice President, the instant case revolves around their inability to elect delegates to the electoral college." *Id.* at 144. Conceding that the text of the Constitution limits participation in the electoral college to states, Judge Pieras held that the Constitution merely explained "the logistics by which the electors of the states elect the President and the Vice President" and "does not preclude the United States citizens in Puerto Rico from voting in Presidential elections." *Id.* Judge Pieras then reviewed Supreme Court precedents dis-

---

**13.** Notably, Romeu does not meet any of the VRA's provisions. The first and second provisions relate to a voter's current state of residence, *see supra* p. 277, and residents of Puerto Rico cannot vote for President and Vice President. *See supra* Part I.C. Although the second provision allows for voting by absentee ballot, the person receiving the absentee ballot must be a "duly qualified resident" of the state issuing the absentee ballot and Romeu is not a duly qualified resident of New York. Romeu does not qualify for the third provision because he began residing in Puerto Rico more than thirty days prior to the 2000 Presidential election. *See supra* p. 277.

cussing the fundamental nature of the right to vote:

> The Court finds that the evolution of constitutional thought can only lead to the inevitable conclusion that United States citizens residing in Puerto Rico have always had the right to enter the ballot box. Ultimately, '[n]o right is more precious in a free country than that of having a voice in the election of those who makes the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our constitution leaves no room for classification of people in a way that unnecessarily abridges that right.' The right to vote is protected because it ensures that citizens, without classification, have a say in electing those who represent them and thereby in the laws which control their lives. Thus, it is inconsistent with that principle to keep U.S. citizens residing in Puerto Rico from the ballot box.

*Id.* at 147 (quoting *Wesberry v. Sanders,* 376 U.S. 1, 17–18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)).

The voting status of all American citizens living in Puerto Rico, including Romeu, eventually will be resolved through one of three paths: (1) appellate review of Judge Pieras' decision; (2) constitutional amendment; or (3) statehood.[14] Romeu must await the outcome of one of those processes, which will establish his right to vote in Presidential elections, before regaining the ability to vote in Presidential elections. Because he does not have a fundamental right to vote in Presidential elections as a former resident of New York, neither the UOCAVA nor NYEL

unconstitutionally prevent him from receiving an absentee ballot.

### 2. Right to Travel

 Romeu argues that the UOCAVA and NYEL violate his right to travel by forcing him to choose between retaining his right to vote in Presidential elections and moving to Puerto Rico. The Supreme Court recently summarized its right to travel jurisprudence:

> The word 'travel' is not found in the text of the Constitution. Yet the constitutional right to travel from one State to another is firmly embedded in our jurisprudence. . . . The 'right to travel' discussed in our cases embraces at least three different components. It protects [ (1) ] the right of a citizen of one State to enter and to leave another State, [ (2) ] the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, [ (3) ] for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Saenz v. Roe,* 526 U.S. 489, 498–500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). A law that burdens the right to travel is subject to strict scrutiny. *See id.* at 499, 119 S.Ct. 1518.

Romeu alleges that the UOCAVA and NYEL violate the first of the three rights identified in *Saenz*—"the right of a citizen of one State to enter and to leave another State." The Supreme Court has held that simply imposing a penalty on interstate travel can unconstitutionally burden a citizen's right to move freely between states. *See Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) ("[I]n moving from State to State or the

---

**14.** On December 13, 1998, Puerto Rico held a plebiscite regarding its future relationship with the United States. Voters were given five options: territorial commonwealth, free association, statehood, independence, and "none of the above." "None of the above" received 787,900 (50.3%) of the votes while statehood received 728,157 (46.5%) of the

votes. The turnout rate for the election was 71.3%. *See* 1998 Status Plebiscite Vote Summary, *http://electionspuertorico.org/1998/summary.html; see also* Jose Trias Monge, *Plenary Power and the Principle of Liberty: An Alternative View of the Political Condition of Puerto Rico,* 68 Rev. Jur. U.P.R. 1, 18–19 (1999) (summarizing plebiscite results).

District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional.") (emphasis in original). The Court has applied that principle to strike down laws in a variety of contexts. *See Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 907–12, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (striking down civil service employment preference for New York residents) (plurality opinion); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 256–70, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (striking down one-year residency requirement for receiving nonemergency hospitalization or medical care at county's expense); *Shapiro,* 394 U.S. at 627–38, 89 S.Ct. 1322 (striking down one-year residency requirement for receiving welfare benefits).

Romeu argues that the same principle applies in this case because the UOCAVA and NYEL penalize his right to travel from New York to Puerto Rico by depriving him of his right to vote in Presidential elections. Romeu's claim, however, is subject to two important limitations. *First,* neither the UOCAVA nor NYEL deprive him of his right to vote in Presidential elections generally. As explained above, Romeu's status as a resident of Puerto Rico causes that deprivation. *See supra* Part II.D.1. At best, the UOCAVA and NYEL unconstitutionally burden Romeu's right to travel by depriving him of his right to vote in Presidential elections in New York. *Second,* New York residents who merely travel to Puerto Rico are not deprived of the right to vote in Presidential elections in New York. In fact, the VRA specifically provided that each state had to allow all duly qualified residents of that state who were absent from that state on the date of the Presidential election to vote by absentee ballot, so long as the resident applied for an absentee ballot at least seven days prior to the Presidential election. *See* 42 U.S.C. § 1973aa–1(d); *see*

*also* N.Y. Election Law § 8–400 (listing permissible circumstances under which "[a] qualified voter may vote as an absentee voter"). Romeu cannot take advantage of that provision because, as a resident of and registered voter in Puerto Rico, he is not qualified to vote in New York. *See* N.Y. Election Law § 5–102(1) ("No person shall be qualified to register for and vote at any election unless he . . . is or will be, on the day of such election, . . . a resident of this state and of the county, city or village for a minimum of thirty days next preceding such election.").

Properly understood, Romeu's argument is that the UOCAVA and NYEL penalize his right to move to Puerto Rico by depriving him of his right to vote in Presidential elections in New York State. In support of his argument, Romeu relies heavily on *Dunn,* in which the Supreme Court held that durational residency requirements for voting unconstitutionally burdened the right to vote and the right to travel. As noted above, however, *Dunn* explicitly "emphasize[d] . . . the difference between bona fide residence requirements and durational residence requirements." *Dunn,* 405 U.S. at 343, 92 S.Ct. 995. Far from holding that a bona fide residency requirement constituted an impermissible burden on the right to travel, the Supreme Court stated:

> An appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny.

*Id.* at 343–44, 92 S.Ct. 995; *see also Carrington,* 380 U.S. at 91, 85 S.Ct. 775 ("Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot."). Having moved to Puerto Rico in May 1999, Romeu does not have a right to receive an absentee ballot from any state, including New York. *See Saenz,* 526 U.S. at 500, 119 S.Ct. 1518 (explaining that "for those travelers who

elect to become permanent residents," the right to travel protects "the right to be treated like other citizens of that state").

### 3. Equal Protection Clause

Romeu contends that the UOCAVA and NYEL violate the Equal Protection Clause by conferring qualified voter status on American citizens living outside the United States while failing to confer that same status on American citizens living in Puerto Rico. The Supreme Court has explained the proper method for analyzing claims under the Equal Protection Clause:

> The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.... The general rule gives way, however, when a statute classifies by race, alienage, or national origin. These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citations omitted).

#### i. Standard of review

■ Romeu argues that the UOCAVA and NYEL are subject to strict scrutiny because they deny absentee ballots to residents of Puerto Rico on the basis of their race, ethnicity, alienage or origin. Neither statute makes such an invidious distinction on its face. The UOCAVA, which allows absent overseas voters to submit absentee ballots to their last state of residence, defines "overseas voter" as "a person who resides outside the United States" and "United States" to include Puerto Rico and

the other territories. *See* 42 U.S.C. §§ 1973ff–1(1), 1973ff–6. The NYEL, which allows voters residing outside the United States to receive absentee ballots from New York, requires that an applicant for an absentee ballot "does not maintain a place of abode or domicile, is not registered to vote and is not voting in any ... territory or possession of the United States." N.Y. Election Law § 11–200(1). On their face, these statutes simply distinguish between American citizens living outside the United States and American citizens living inside the United States. *See Igartua I*, 32 F.3d at 10 (explaining that the UOCAVA "does not distinguish between those who reside overseas and those who take up residence in Puerto Rico, but between those who reside overseas and those who move anywhere within the United States"). Both statutes merely state that territories of the United States, including Puerto Rico, are not considered "outside the United States."

■ Romeu correctly points out, however, that "[a] statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race." *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Supreme Court has explained that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id.* at 242, 96 S.Ct. 2040. Romeu argues that residents of Puerto Rico are members of a suspect class, defining that class as "a race or ethnic group of 'Taino Indian, Black, European, and more recently, Anglo–American ancestry'." Pl. Br. at 48 (quoting *Franceschi v. Hyatt Corporation*, 782 F.Supp. 712, 720 (D.P.R.1992) ("It is a generally accepted fact, and this Court takes judicial notice, that Puerto Ricans are of Taino Indian, Black, European and, more recently, Anglo–American ancestry (to name a few) and, more often than not, a mixture of two

or more of the above.")).[15] Romeu then contrasts the inability of Puerto Ricans to receive absentee ballots with the ability of United States citizens of European descent to return to Europe and continue to receive absentee ballots. According to Romeu, that contrast reflects the discriminatory purpose of the UOCAVA and NYEL.

In support of his argument that Puerto Ricans are a suspect class, Romeu notes that discrimination against Puerto Ricans is actionable under 42 U.S.C. § 1981. *See Franceschi,* 782 F.Supp. at 720 ("[C]ourts have recognized that discrimination against Hispanics is actionable under § 1981."); *see also Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987) (stating that "persons like plaintiff who are of Puerto Rican descent" are a "protected minority" for purposes of 42 U.S.C. § 1981). That does not mean, however, that Puerto Ricans are a suspect class under the Equal Protection Clause. *See Washington,* 426 U.S. at 239, 96 S.Ct. 2040 ("We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today."). Indeed, several cases suggest that Congress's power to make laws regarding Puerto Rico and all the other territories is subject to rational basis review. *See Harris v. Rosario,* 446 U.S. 651, 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) ("Congress, which is empowered under the Territory Clause of the Constitution ... to 'make all needful Rules and Regulations respecting the Territory ... belonging to the United States,' may treat Puerto Rico differently from States so long as there is a rational basis for its actions.") (per curiam) (quoting U.S. Const. art. IV, § 3, cl. 2); *see also Besinga v. United States,* 14 F.3d 1356, 1360 (9th Cir.1994) ("[T]he broad powers of Congress under the Territory Clause are inconsistent with the application of heightened judicial scrutiny to economic legislation pertaining to the territories."); *Quiban v. Veterans Administration,* 928 F.2d 1154, 1160 (D.C.Cir.1991) ("By definition ... residents of territories lack equal access to channels of political power. To require the government, on that account, to meet the most exacting standard of review ... would be inconsistent with Congress's large powers [under the Territory Clause.]") (quotation marks and citations omitted).

Even assuming that Puerto Ricans are a suspect class, Romeu has failed to proffer facts sufficient for this Court to ascribe an invidious discriminatory purpose to either the UOCAVA or NYEL. *See Washington,* 426 U.S. at 242, 96 S.Ct. 2040 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."). Although Romeu prominently mentions the possibility that United States citizens of European descent will return to Europe and continue to vote in New York, he fails to acknowledge that both the UOCAVA and NYEL allow United States citizens of Hispanic, African–American or Indian descent residing in any of the fifty states to receive an absentee ballot when they move outside the United States. Conversely, all United States citizens, including Anglo–American citizens, are unable to receive an absentee ballot under the UOCAVA and NYEL once they have moved to Puerto Rico. Indeed, a United States citizen living in Puerto Rico, such as Romeu himself, could move to New York and establish his qualifications to vote here. If that person then moved to any country outside the United States, he would be entitled to receive an absentee ballot under the UOCAVA and

---

**15.** Romeu also explains that residents of the other territories are predominantly members of minority groups. *See* Pl. Br. at 48 ("98% of the residen[ts] of American Samoa are minorities, mainly Samoan; 90% of the residents in Guam are non-white, with the majority being Chamorro and Filipino; and 80% of the residents of the Virgin Islands are African–American.").

NYEL. As a result, there is no basis for concluding that either the UOCAVA or NYEL invidiously discriminates against Puerto Ricans on the basis of race, alienage or national origin.

Defendants raise an additional basis for applying rational basis review rather than strict scrutiny. In *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), the Supreme Court considered a challenge to section 4(e) of the Voting Rights Act of 1965 insofar as it prohibited the enforcement of the election laws of New York requiring an ability to read and write English as a condition of voting. After ruling that the English literacy requirement could not be enforced to the degree it conflicted with § 4(e), the Court then turned to the question of whether § 4(e) worked an invidious discrimination "by prohibiting the enforcement of the English literacy requirement only for those educated in American-flag schools (schools located within United States jurisdiction) in which the language of instruction was other than English, and not for those educated in schools beyond the territorial limits of the United States in which the language of instruction was also other than English." *Id.* at 656. The Court gave the following explanation for its decision to apply rational basis review:

> This is not a complaint that Congress, in enacting § 4(e), has unconstitutionally denied or diluted anyone's right to vote but rather that Congress violated the Constitution by not extending the relief effected in § 4(e) to those educated in non-American-flag schools.... Section 4(e) does not restrict or deny the franchise but in effect extends the franchise to persons who otherwise would be denied it by state law.... [T]he principle that calls for the closest scrutiny of distinctions in laws denying fundamental rights ... is inapplicable; for the distinction challenged by appellees is presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise. Rather, in deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.

*Id.* at 656–57, 86 S.Ct. 1717 (quotation marks and citations omitted).

The rationale in *Morgan* applies here as well. The UOCAVA and NYEL extend the franchise to American citizens living outside the United States. As I have already explained, neither statute denies Romeu his fundamental rights to vote or to travel. Romeu argues that these statutes do not go far enough because they fail to extend the franchise to American citizens living in Puerto Rico who previously had voted in one of the states. As in *Morgan,* rational basis review is required to determine whether that "challenged limitation on the relief effected [by the UOCAVA and NYEL] was permissible." *Id.* at 657, 86 S.Ct. 1717.

### ii. Rational basis

 There is no question that, under the UOCAVA and NYEL, American citizens who move to France after previously voting in New York can obtain absentee ballots to vote in Presidential elections while American citizens who move to Puerto Rico after previously voting in New York cannot. This Court must determine whether there is a rational basis for that distinction. Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249. I concur with the First Circuit's conclusion that the UOCAVA met this standard:

> Without the [UOCAVA], voters who move overseas could lose their right to

vote in all federal elections. However, voters who move to a new residence within the United States are eligible to vote in a federal election in their new place of residence. Hence, Congress had a rational basis for seeking to protect the absentee voting rights only of the former. While the [UOCAVA] does not guarantee that a citizen moving to Puerto Rico will be eligible to vote in a Presidential election, this limitation is not a consequence of the [UOCAVA] but of the constitutional requirements [for participating in Presidential elections]. *Igartua I*, 32 F.3d at 10–11. In addition, Congress had a legitimate state interest in refusing to define Puerto Rico as "outside the United States" for purposes of the UOCAVA because Puerto Rico is not outside the United States. Puerto Rico is a territory of the United States and Congress had a legitimate interest in reaffirming that status. Finally, it is not clear that Congress could simply have extended the provisions of the UOCAVA to cover American citizens living in Puerto Rico who previously had voted in one of the states. "Only a . . . constitutional amendment or a grant of statehood to Puerto Rico, therefore, can provide [American citizens living in Puerto Rico] the right to vote in the presidential election which they seek." *Igartua I*, 32 F.3d at 10; *see also Territory of Guam*, 738 F.2d at 1019 (same for residents of Guam); U.S. Const. amend XXIII (giving residents of the District of Columbia the right to vote in Presidential elections).[16]

■ As for the NYEL, New York State has a legitimate interest in restricting the ballot to bona fide residents and ensuring that someone who wishes to vote in New York State "does not maintain a place of abode or domicile, is not registered to vote and is not voting in any other election district, state, territory or possession of the United States." N.Y. Election Law § 11–200(1); *see also Carrington*, 380

U.S. at 91, 85 S.Ct. 775 ("Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot."). As explained above, any resulting limitation on the ability of American citizens living in Puerto Rico to vote in the Presidential election is a consequence not of the NYEL but of the constitutional status of Puerto Rico.

### 4. Privileges and Immunities Clause

■ Romeu argues that the UOCAVA and NYEL violate the Privileges and Immunities Clause by depriving him of a privilege enjoyed by New York residents—the ability to vote by absentee ballot in a Presidential election—solely because he has moved to Puerto Rico. The Privilege and Immunities Clause states: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. Romeu's claim fails for three reasons. *First*, the Supreme Court has suggested, albeit in dicta, that Romeu's specific claim cannot prevail. *See Baldwin v. Fish and Game Commission*, 436 U.S. 371, 383, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) ("Suffrage . . . has always been understood to be tied to an individual's identification with a particular State. No one would suggest that the Privileges and Immunities Clause requires a State to open its polls to a person who declines to assert that the State is the only one where he claims a right to vote.") (citation omitted). *Second*, Romeu's claim does not come within the purpose of the Privileges and Immunities Clause, as defined by the Supreme Court:

[I]t has come to be the settled view that Article IV, § 2, does not import that a citizen of one State carries with him into another fundamental privileges and immunities which come to him necessarily by the mere fact of his citizenship in the State first mentioned, but, on the contrary, that in any State every citizen of

---

**16.** For an argument that Congress can and should extend the UOCAVA, *see* Cottle, Com-

ment, *Silent Citizens*, 1995 U. Chi. Legal F. 315.

any other State is to have the same privileges and immunities which the citizens of that State enjoy.

*Id.* at 382, 98 S.Ct. 1852 (quoting *Hague v. CIO*, 307 U.S. 496, 511, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). *Third*, Romeu's claim under the Privileges and Immunities clause essentially repeats his earlier claims, which have already been rejected. *See* Pl. Br. at 50–52 ("The Privileges and Immunities Clause protects the fundamental right of U.S. citizens, such as the right to vote and the right to travel asserted in this case.... The fact that former New York residents who move to foreign countries or to other states can continue to vote by absentee ballot amplifies New York State's deprivation of my fundamental right to vote simply because I have established residency in Puerto Rico.").

### E. Summary

Although I am unable to afford Romeu the relief he seeks, there is little doubt that all American citizens living in Puerto Rico are suffering a grave injustice. As American citizens, they should be allowed to vote for their national leader. *See Sanchez v. United States*, 376 F.Supp. 239, 242 (D.P.R.1974) ("[I]t is inexcusable that there still exists a substantial number of U.S. citizens who cannot legally vote for the President and Vice President of the United States."). While I disagree with his legal conclusions, Judge Pieras' moving discussion of the underlying injustice deserves to be repeated here:

> Like United States citizens residing in the District of Columbia and the fifty states, those residing in Puerto Rico have fulfilled the highest calling of citizenship, fighting and dying in the battlefields in two world wars, the Korean, Vietnam and Gulf wars. Still, despite paying for their citizenship with blood, U.S. citizens residing in Puerto Rico have not entered the Presidential ballot box. It is inconceivable to our constitutional order to expect that the government can place our nation's sons and daughters in harm's way and not recognize the power of those individuals to have a say in electing those who will make that decision.

*Igartua II*, at 145. If Judge Pieras' decision is overturned, only statehood or a constitutional amendment can provide relief to the people of Puerto Rico. *See Sanchez*, 376 F.Supp. at 242 ("[U]ntil the Commonwealth votes for Statehood, or until a constitutional amendment is approved which extends the presidential and vice presidential vote to Puerto Rico, there is no substantial constitutional question raised by plaintiff...."). All I can do is add my voice to those who have encouraged Congress to initiate the process of amending the Constitution at the earliest possible time.

### III. CONCLUSION

For the foregoing reasons, plaintiff's complaint and plaintiff-intervenor's complaint in intervention are DISMISSED. The Clerk of the Court is directed to close this case.